[Cite as *Wittenbrook v. Electronics Recycling Servs.*, 2018-Ohio-208.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| KRISTEN WITTENBROOK | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 16 BE 0023 |
| VS. | ) | |
| | ) | OPINION |
| ELECTRONICS RECYCLING | ) | |
| SERVICES, INC., et al. | ) | |
| | ) | |
| DEFENDANTS-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from the Court of Common Pleas, of Belmont County, Ohio Case No. 13 CV 166

JUDGMENT: Affirmed.

APPEARANCES:
For Plaintiff-Appellee                      Attorney Patrick Cassidy
                                            The First State Capital
                                            1413 Eoff Street
                                            Wheeling, West Virginia 26003

For Defendant-Appellant, JJS                Attorney Paul Flowers
Developments, Ltd.                          Attorney Timothy Cogan
                                            Terminal Tower, Suite 1910
                                            50 Public Square
                                            Canfield, Ohio 44113

For Defendants, Electronics Recycling       Attorney Bradley Shafer
Services, Inc. and Dan Brown                1233 Main Street, Suite 1000
                                            Wheeling, West Virginia 26003

JUDGES:

Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

Dated: January 8, 2018

DeGENARO, J.

{¶1} Defendant-Appellant, JJS Developments, Ltd., appeals the judgment of the trial court entering a jury verdict against it and in favor of Plaintiff-Appellee, Kristen Wittenbrook, on her sexual harassment/hostile work environment and retaliatory discharge claims. JJS argues the trial court's jury interrogatories as to joint employer liability were erroneous and that the trial court erred by overruling JJS's motions for directed verdict on the issue of whether it was liable as a joint employer. Finally, JJS asserts that the trial court committed plain error by failing to sua sponte address allegedly improper comments made by Wittenbrook's counsel during closing arguments. For the following reasons, JJS's assignments of error are meritless and the judgment of the trial court is affirmed.

### Facts and Procedural History

{¶2} Wittenbrook began working in marketing at Defendant Electronic Recycling Services Inc. (ERS Ohio) in May 2012. Several months later, Wittenbrook claimed that a coworker sexually harassed her and intimidated her. She reported the incident; however, she claimed that management—specifically, senior vice president of operations at ERS Ohio, Defendant Daniel Brown—failed to investigate and deal with the allegations, instead mocking her by displaying sexual harassment posters and portraying her as a drama queen to other employees. Brown then disciplined Wittenbrook for including a non-employee consultant on an email referencing the harassment, and ultimately terminated her from her position at the company.

{¶3} This appeal does not center on the facts of the underlying sexual harassment and retaliatory discharge allegations, but rather on ERS Ohio's corporate relationship to Defendant-Appellant JJS.

{¶4} ERS Ohio was an Ohio corporation doing business in Bellaire, Ohio. Specifically, it was a recycling facility that would accept recyclable materials, store them and then resell them. Wittenbrook initially worked in a marketing position, then as an assistant to the general manager, and finally as part of the R2 compliance group. ERS Ohio was pursuing its R2 certification, which demonstrates a level of environmentally-responsible recycling; it ensures that the facility is disposing of

materials properly. An R2 certification can make the recycling company more marketable to companies who do business with it.

**{¶5}** The owners of ERS Ohio were Sam Kazemeini, a company called Molam, and Brown. Kazemeini was president of ERS Ohio even though he worked out of Toronto exclusively. Brown was senior vice president for operations, Jim Johnston was the general manager or head of operations, and Zak Bobek, served as acting general manager for ERS Ohio when Johnston was working in the Chicago facility and Brown was out of town.

**{¶6}** JJS was located in Scarborough, Ontario, Canada, which is a suburb of Toronto. Kazemeini had an ownership interest in JJS and was also its president. JJS had a number of other facilities like ERS Ohio that were either operating, or in development, in the United States, such as Chicago and Indianapolis, and throughout the world, such as Mexico, China and the Bahamas.

**{¶7}** Wittenbrook entered into a non-competition, non-solicitation and confidentiality agreement prior to commencing her employment at ERS Ohio. The non-compete agreement, dated May 10, 2012, states that it is entered into between "Electronics Recycling Services Ltd., with a head office at 2450 Lawrence Avenue East, Unit #3-15, Scarborough, Ontario, M1P 2R7 ('The Employer')" and "Kristin Lee Wittenbrook ('The Employee')" The non-compete agreement provides that it "will be construed in accordance with and governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein." While at least one defense witness attempted to distance Electronics Recycling Services Ltd. from JJS, it is undisputed that JJS did business under a number of names, including "ERS International." A defense witness referred to "ERS International," under which JJS operated, "as our main office."

**{¶8}** According to Dilan Patel, who was the chief financial officer of JJS, ERS Ohio received nearly all of its funding for start-up and operational costs from JJS. Paula Pronesti, who was the global financial controller for JJS, prepared profit and loss statements for ERS Ohio. She explained that "being part of the global team, we

were able to access all of the other locations." She said she assisted Patel with managing the budgets for various locations.

**{¶9}** Brown testified he was in contact with JJS daily on a variety of matters, "[e]verything from current market prices for metals, to what the procedures were, to employee issues from a perspective of payroll amounts and things like that." Brown was also in contact with JJS regarding compliance issues. Patel testified that when ERS Ohio had major contract opportunities, JJS would first review them.

**{¶10}** Alfea Principe, global director of compliance for JJS, testified she was in charge of managing ERS Ohio, among other JJS locations, from a compliance perspective. Principe took on additional managerial functions with respect to ERS Ohio. For example, JJS and ERS employees all used the same email domain name: ers-international.com, and Brown asked Principe to make email address and password changes for three ERS Ohio employees. Further, when Brown barred Wittenbrook from returning to her building to work, Principe ordered that Brown permit her back inside. Wittenbrook testified that, thereafter, she was placed under Principe's direct supervision. That testimony is supported by an email where Wittenbrook identifies Principe as her supervisor and in her reply Principe fails to dispute this.

**{¶11}** Wittenbrook testified that Principe also discussed promotion opportunities with her; specifically, that Wittenbrook could move on to manage the R2 certification process for other JJS facilities in the United States and abroad since she had been part of the first team to lead a JJS facility through a successful R2 certification process.

**{¶12}** With regard to JJS's involvement in dealing with the sexual harassment allegations, JJS was apprised of Wittenbrook's complaint according to Dilan Patel, the CFO of JJS. Patel worked in the Toronto location of JJS, which he called the global operations center. In addition, Brown was concerned that the sexual harassment allegations would bring negative scrutiny by JJS upon ERS Ohio. Principe testified that the decision to fire Wittenbrook was made by Brown and

Kazemeini, who, as mentioned, had an ownership interest in both ERS Ohio and JJS.

{¶13} Additional evidence of the interrelatedness of the two companies can be seen by JJS's response to a fire that destroyed part of the ERS Ohio facility. The check for the insurance proceeds paid for the damages from the fire was made out to JJS. When the facility later resumed some business operations after the fire, JJS sent someone to manage that undertaking and report back to JJS. Ultimately, JJS closed many of its facilities outside of Canada, including ERS Ohio.

{¶14} In May 2013, Wittenbrook filed the instant suit against ERS Ohio and Daniel Brown. She later added JJS as a defendant in July 2015. The amended complaint alleged that JJS and ERS Ohio were Wittenbrook's joint employers and raised sexual harassment, retaliatory discharge and tortious interference with employment claims.

{¶15} JJS filed a summary judgment motion arguing there was no evidence that its own employees and agents had engaged in any of the harassment or abuse that Wittenbrook had claimed to suffer at ERS Ohio. Wittenbrook countered that JJS and ERS Ohio were so integrated that JJS should be liable under a joint employer theory. In its reply brief, JJS objected to Wittenbrook's allegation that it was a joint employer, claiming it was not properly pled in the amended complaint. Alternatively, JJS sought a continuance to allow for discovery and retention of expert witnesses on that issue. JJS's motion for summary judgment was denied immediately before trial.

{¶16} The matter proceeded to a jury trial on April 12, 2016. At the close of Wittenbrook's case, JJS moved for a directed verdict of no liability on the grounds of insufficient evidence that it was a joint employer with ERS Ohio. Wittenbrook countered she had made out a prima facie case and the trial court overruled JJS's motion. At the close of the Defendants' case, the motion was renewed and overruled.

{¶17} JJS objected to the jury instructions on joint employer liability, along with the form of the interrogatories, which were overruled by the trial court.

{¶18} Only the claims of retaliatory discharge and hostile work environment were submitted to the jury, which found in favor of Wittenbrook on both claims and

that ERS and JJS were joint employers of Wittenbrook. The jury awarded Wittenbrook $700,000 in economic damages and $250,000 in general damages. It also awarded her $1 in punitive damages against each of the three defendants.

**{¶19}** Only JJS appealed. JJS does not challenge the verdicts on the substantive claims of retaliatory discharge and a hostile work environment; instead, it attacks the judgment primarily as to the joint employer theory of liability.

**{¶20}** At the time the appeal was filed, several post-judgment motions were pending in the trial court, and the appeal was stayed. On June 7, 2016, the trial court issued an order resolving all outstanding issues.

**Denial of Motion for Directed Verdict**

**{¶21}** In its first of three assignments of error, JJS asserts:

> The trial judge erred, as a matter of law, by denying the motions for directed verdict as to JJS.

**{¶22}** JJS first argues that the trial court erred by allowing the jury to consider the issue of joint employer liability. JJS claims Wittenbrook failed to properly plead this claim in her amended complaint, stating the claim for the first time in her opposition brief to JJS's summary judgment motion. A claim for relief is stated if the complaint contains a short, plain statement of the claim showing the party is entitled to relief and a demand for judgment. Civ.R. 8(A). "A complaint alleges the elements of the claim with sufficient particularity if it gives reasonable notice of the claim to opposing parties." *Bahen v. Diocese of Steubenville*, 7th Dist. No. 11 JE 34, 2013-Ohio-2168, ¶ 11. Wittenbrook's amended complaint states as follows:

> Defendant JJS Developments ("315"), is a foreign corporation with a principal place of business at 2450 Lawrence Avenue East Unit 3-15, Scarborough, Ontario, MI P 2R7 and is the parent corporation of ERS and has at all times relevant herein been a "*Joint-Employer*" of Plaintiff, is in the business of collecting, recycling, and selling electronic

devices and metals recovered from them. ERS [Ohio] and JJS are "the ERS Defendants."

(Emphasis added.)

**{¶23}** The Amended Complaint further states: "The conduct of the ERS Defendants amounts to retaliation against Plaintiff for her complaints."

**{¶24}** Thus, the amended complaint gives reasonable notice to JJS that Wittenbrook alleges it is liable as a joint employer theory.

**{¶25}** A trial court's decision granting a motion for directed verdict presents a question of law, which an appellate court reviews de novo. *Carter v. R & B Pizza Co., Inc.*, 7th Dist. No. 09JE34, 2010-Ohio-5937, ¶ 15.

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Civ.R. 50(A)(4).

**{¶26}** A motion for directed verdict tests the sufficiency of the evidence at trial, not the weight of such evidence or the credibility of witnesses. *Sayavich v. Creatore*, 7th Dist. No. 07-MA-217, 2009-Ohio-5270, ¶ 44. "[T]he court is confronted solely with a question of law: Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury?" *One Step Further Physical Therapy, Inc. v. CTW Dev. Corp.*, 7th Dist. No. 11 MA 66, 2012-Ohio-6137, ¶ 35.

**{¶27}** The concept of joint employer liability has not been discussed at length in Ohio case law. As a general matter, it is a judicially-created doctrine that can be used to impose liability on one business enterprise for the employment actions of a

related or subsidiary enterprise. As explained in greater detail in federal employment law jurisprudence, there are several sub-species of this doctrine that allow for liability on the part of the parent company. *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir.1997) (explaining the three different approaches courts use to impose employer liability on a parent company or related entity.)

**{¶28}** As the Eighth District has explained: "[T]wo entities may be considered a single joint employer if, upon review of their intercorporate relationship, one exercises a degree of control that exceeds the control normally exercised by a parent corporation over its separate and distinct subsidiary corporation." *Wilmot v. Forest City Auto Parts*, 8th Dist. No. 75945, 2000 WL 804616, *3, citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337-1338 (6th Cir.1983). "Relevant considerations include: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control." *Id.*, citing *Armbruster*. The jury was instructed as to this four-factor test.

**{¶29}** JJS asserts there was insufficient evidence presented at trial to demonstrate its liability under this theory and that the trial court therefore erred in denying its motion for directed verdict. It bears repeating that for the purposes of this analysis, the evidence presented at trial must be viewed in the light most favorable to Wittenbrook. Thus, purported evidentiary conflicts are not before us.

**{¶30}** Regarding the first factor, interrelations of operation, JJS cites *Howard v. Bobby D. Thompson, Inc.*, 2d Dist. No. 24357, 2011-Ohio-3503, for the proposition that when determining the interrelation between the operations of two companies, factors to be taken into account include common offices and equipment, record keeping and bank accounts. *Id.* at ¶ 29. Alfea Principe of JJS stated that she managed ERS Ohio from a compliance perspective and provided form documents to ERS Ohio and other JJS facilities that could be used for the R2 certification process. There is a global financial controller for JJS, who kept records relating to the finances of both JJS and ERS Ohio and helped manage the budgets of the various JJS locations. At times, Johnston, general manager for ERS Ohio, worked in the ERS

Chicago facility. He continued to assume a management role at ERS Ohio while he was in Chicago. Brown testified he was in contact with JJS daily on a variety of matters, "[e]verything from current market prices for metals, to what the procedures were, to employee issues from a perspective of payroll amounts and things like that." Brown was also in contact with JJS regarding compliance issues. Patel testified that when ERS Ohio was presented with major contract opportunities, JJS would first review them.

{¶31} After a fire destroyed part of the ERS Ohio facility and it later resumed some business operations, JJS sent someone to manage that undertaking and report back to JJS. When asked why an attempt was made to reopen it at all given its financial problems, Patel the CFO of JJS, explained that "losing a location isn't very good for our company's image."

{¶32} Regarding the second factor, common management, Kazemeini was the president of both companies. Although standing alone, this might not impose liability on JJS as a joint employer, there was additional evidence that JJS managers oversaw business operations at ERS Ohio. JJS had a global compliance manager and a global financial controller who managed aspects of the ERS Ohio business.

{¶33} Regarding the third factor, centralized control of labor relations, although there was testimony that ERS Ohio was fairly autonomous regarding day-to-day management of employees, Wittenbrook testified that Principe discussed a potential raise and promotion with her. Wittenbrook further testified that Principe of JJS assumed a supervisory role over her after conflicts arose between Wittenbrook and Brown. Principe testified that the decision to fire Wittenbrook was made by Brown and Kazemeini, who has an ownership interest in both companies and is president of both. The non-compete agreement Wittenbrook entered into upon her hire stated it was made between her and Electronic Recycling Services Ltd., with its main office in Scarborough, Ontario, Canada; it further specified that Canadian law would govern.

{¶34} Regarding the fourth factor, common ownership and financial control,

ERS Ohio was entirely dependent on JJS for funding. When a fire destroyed part of the ERS Ohio facility, the insurance check was made to JJS. Kazemeini had ownership interests in both companies as well, but worked in Canada. JJS's CFO and global financial controller worked to manage ERS Ohio's budget.

{¶35} Based on the totality of the circumstances, there was sufficient evidence presented that JJS was acting as a single joint employer with ERS Ohio. Accordingly, JJS's first assignment of error is meritless.

### Jury Interrogatories

{¶36} JJS's second of three assignments of error asserts:

> The trial judge erred, as a matter of law, in its instructions relating to joint employer liability.

{¶37} JJS specifically takes issue with the jury interrogatories used at trial, contending they were erroneous in ways that prejudiced JJS and denied it a fair trial. Civ.R. 49(B) governs jury interrogatories and provides, in pertinent part:

> The court shall submit written interrogatories to the jury, * * * upon request of any party prior to the commencement of argument. * * * The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

{¶38} Thus, "[f]ollowing a timely request by a party, a mandatory duty arises to submit written interrogatories to the jury, provided they are in the form the court approves." *Cincinnati Riverfront Coliseum, Inc. v. McNulty, Co.*, 28 Ohio St.3d 333, 336, 504 N.E.2d 415 (1986). The rule does not mandate that the trial court act as a mere conduit and submit all proposed interrogatories to the jury under all circumstances. *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 107,

592 N.E.2d 828 (1992). "[T]he trial court has limited discretion to reject interrogatories if they do not refer to a determinative issue or if they are ambiguous, confusing, incomplete, redundant or otherwise legally objectionable." *Davis v. Georgopoulos*, 7th Dist. No. 08 MA 85, 2008-Ohio-6368, ¶ 11, citing *Ramage* at 107-108.

**{¶39}** "The standard under which we review a trial court's decision whether to submit a proposed interrogatory is abuse of discretion." *Freeman v. Norfolk & Western Ry. Co.*, 69 Ohio St.3d 611, 614, 635 N.E.2d 310 (1994). An abuse of discretion means the trial court's decision is unreasonable based upon the record; that the appellate court may have reached a different result is not enough to warrant reversal. *Downie v. Montgomery*, 7th Dist. No. 12 CO 43, 2013–Ohio–5552, ¶ 50.

**{¶40}** JJS first argues that the jury interrogatories failed to separate out questions of liability between each defendant, making it impossible for the jury to find liability on behalf of any one defendant without finding liability on behalf of all. Second, JJS asserts the jury interrogatories were not sufficiently detailed on the issue of joint employer liability to truly determine whether the jury found that JJS and ERS Ohio were joint employers of Wittenbrook.

**{¶41}** To Interrogatory No. 1, the jury answered affirmatively: "We the jury find in favor of the Plaintiff, and against Defendants, on her claim of retaliatory discharge." Interrogatory No. 2, which the jury also answered in the affirmative, provides, "Do you find that Kristin Wittenbrook has proven, by a preponderance of the evidence, that both Defendant Electronic Recycling Services and the Defendant JJS Developments were joint-employers of Kristin Wittenbrook."

**{¶42}** At trial, JJS objected to the interrogatories, stating: "To the extent that the defendants were not separated into ERS Ohio, Defendant JJS and Defendant Dan Brown, I object." JJS also objected to the interrogatories and verdict form regarding the joint employer liability theory. ("My objection to the jury instructions also carry over to the jury interrogatories and the verdict form on the joint employer and not separating out of the defendants."). The trial court overruled the objections.

**{¶43}** While the interrogatories could have been more specific as to the liability of each defendant, they did not cause prejudice to JJS so as to warrant reversal for new trial. Had the jury answered no on the joint employer interrogatory this would have relieved JJS from liability even if the jury had found in favor of Wittenbrook and against defendants on the other interrogatory form that addressed the retaliatory discharge claim.[1]

**{¶44}** "[T]he main purpose of jury interrogatories is to test the correctness of a general verdict by asking the jury to disclose its opinion on the determinative issues in a case based upon the trial evidence." *Davis v. Georgopoulos*, 7th Dist. No. 85–2006, 2008-Ohio-6368, ¶ 10, citing *Cincinnati Riverfront Coliseum, Inc. v. McNulty, Inc.*, 28 Ohio St.3d 333, 336-337, 504 N.E.2d 415 (1986). The interrogatories in this case do just that. They are not ambiguous, confusing, incomplete, redundant or otherwise legally objectionable; thus the trial court did not abuse its discretion by failing to reject them. Accordingly, JJS's second assignment of error is meritless.

### Plain Error in Closing Arguments

**{¶45}** In its third and final assignment of error, JJS asserts:

> Plaintiff counsel [sic] committed reversible misconduct in closing argument, and the trial court erred by failing to sua sponte act to address the misconduct and limit the prejudice.

**{¶46}** JJS takes issue with statements made by Wittenbrook's counsel during his closing, but made no objection to these statements during trial. Accordingly, this argument is subject to plain error review. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial

---

[1] Interrogatory 3, the hostile work environment/sexual harassment jury interrogatory was answered in the affirmative, avoids these issues in that it simply states: "We the jury find on behalf of the Plaintiff, Kristen Wittenbrook, on her claim of hostile work environment." However, it does not say "against the Defendants" like the retaliation interrogatory does.

process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), at paragraph one of the syllabus.

**{¶47}** In *Goldfuss*, the Court explained that the doctrine shall only be applied in extremely unusual circumstances where the error complained of, if left uncorrected, would have a material adverse effect on the character of and public confidence in judicial proceedings. *Id.* at 121. The Court concluded that the public's confidence is rarely upset merely by forcing civil litigants to live with the errors they themselves or the attorney chosen by them committed at trial. *Id.* at 121-122.

**{¶48}** JJS argues that Wittenbrook's counsel improperly alleged during his closing that JJS was playing a "corporate shell game," further comparing JJS's actions to those of large coal companies he had dealt with in practice. It is helpful to put these remarks into the context of the overall argument being made at that point of the closing which was as follows:

> And that's probably one of the big issues in this case, because in a verdict form, you're going to have to find whether or not JJS was a joint employer of Kristen Wittenbrook, along with ERS Bellaire. And we think the evidence is overwhelmingly that it was or that she was or they were a joint employer [sic]. Sam [Kazemeini, of both JJS and ERS] was involved in the decision to terminate her.

> She signed the agreement [the non-compete] with the Canadian company, yet another name though, remember. When we go through the exhibits, the name they use there was Electronics Recycling Services International Limited from Ontario. That's the agreement she signed. We were told yesterday that, Well, that's different from JJS. That's just the name we do business for JJS.

> Ladies and Gentlemen of the Jury, the Court just told you in its

instruction, don't give up your common experience. They play a shell game, defendants in this case. Oh, ERS Bellaire, not making any money. JJS makes money, but we don't employ her, that's Bellaire. And you've heard it before, your common experience.

We see it in representing employees all the time in the coal industry where the subsidiaries go bankrupt and get out of all their obligations to their employees and the parent company's doing just fine. But they set up a subsidiary separate company and says, Oh, sorry, we got to file bankruptcy and get out of our obligations. It's a corporate shell game is what JJS played with Kristin Wittenbrook, and the evidence is overwhelmingly [sic] on that.

**{¶49}** The trial court's failure to sua sponte address these comments and provide curative instructions to the jury do not amount to plain error. "Closing arguments are not evidence, and it is generally presumed the jury followed the court's instructions as to this topic." *Cosgrove v. Omni Manor*, 2016-Ohio-8481, 78 N.E.3d 223, ¶ 56 (7th Dist.) Further, "[c]ounsel generally has wide latitude in closing arguments." *West v. Curtis*, 7th Dist. No. 08 BE 28, 2009-Ohio-3050, ¶ 89, citing *Pang v. Minch*, 53 Ohio St.3d 186, 194, 559 N.E.2d 1313 (1990). There was evidence presented that ERS Ohio was totally dependent upon JJS for funding, to the point where, when a fire destroyed much of the ERS Ohio facility, the insurance check was made out directly to JJS. ERS Ohio did business under the name ERS International, but yet JJS's position was that it was not a party to the non-compete entered into between "Electronic Recycling Services Limited," and Wittenbrook. The shell game comments were merely intended to highlight these issues.

**{¶50}** JJS cites a number of Florida cases in support of this assignment of error, which this court is not bound to follow. The Ohio Supreme Court case JJS cites, *Pesek v. Univeristy Neurologists*, 87 Ohio 3d 495, 721 N.E.2d 1011 (2000), is factually distinguishable. In *Pesek*, the Court held that personal attacks on plaintiff's

counsel and her expert during closing were grounds for reversal, even under a plain error review. Specifically, in his closing argument, defendant's counsel accused plaintiff's counsel of "half-truths," "untruths," and "the threatening of witnesses, [and] the suppression of evidence," and called patient's expert witness a "second-class expert" who "bought his way into pediatric neurology." *Id.* at 501-503. The Court noted that under those circumstances, " 'where gross and abusive conduct occurs, the trial court is bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.' " (Emphasis deleted.) *Id.* at 501, quoting *Snyder v. Stanford*, 15 Ohio St.2d 31, 37, 238 N.E.2d 563 (1968).

**{¶51}** Here, in contrast, counsel's comments in closing about JJS playing a corporate shell game, do not constitute gross and abusive conduct, nor do they seriously affect the basic fairness, integrity, or public reputation of the judicial process. Thus, they do not rise to the level of plain error. Accordingly, JJS's third assignment of error is also meritless.

**{¶52}** In sum, all of JJS's assignments of error are meritless and the judgment of the trial court is affirmed.

Waite, J., concurs.

Robb, P. J., concurs.